In the Matter of the ESTATE of
Albert C. KINGSEED.

No. 2–478A122.

Court of Appeals of Indiana,
Fourth District.

Dec. 15, 1980.

Rehearing Denied Jan. 22, 1981.

Frank E. Tolbert and Kim S. Walker, Miller, Tolbert, Hirschauer & Wildman, Logansport, for appellants.

J. Conrad Maugans, Bayliff, Harrigan, Cord & Maugans, Kokomo, John Hurley, Jerkins, Plaszczak, Silaski & Hurley, Kalamazoo, Mich., for appellees.

MILLER, Judge.

By way of appeal and cross–appeal the heirs and former executor of the Estate of Albert C. Kingseed [1] are challenging rulings of the trial court, after a hearing in 1977 on the executor's final account, which 1) ratified, for the most part, a partial distribution of real property made by the executor seven years earlier without prior court approval, 2) ordered distribution of general bequests effective as of the ratified date of the distribution of the real property, and 3) ordered a reduction of attorney and executor fees.

---

1. Appellants in this case are designated as Joseph A. Noel, former executor and attorney for the estate, and Beverly Evans, Jean Gesse, and Nancy Kingseed and Terry Kingseed, grandchildren of the testator and children of Robert Kingseed, the testator's deceased son. Appellees are Geneva Wolff, the testator's daughter, and Marilyn Foland, the testator's granddaughter. Both Wolff and Foland are residuary and general legatees.

We affirm in part and reverse in part.

In their motions to correct errors and in their briefs, the parties raise the following issues:

1) Did the special judge err in ratifying, in substantial part, the former executor's unauthorized partial distribution of real property?

2) Did such judge err in determining the distributees of said real property were not entitled to income collected during the first year of administration, and in requiring them to repay it to the estate?

3) Was the special judge vested with authority to retroactively distribute general bequests on his own motion?

4) Was it an abuse of discretion for the trial court to reject the $11,850 executor–attorney fees requested and award the amount of $6,030?

5) Did the trial court err in failing to find the executor had mismanaged certain rental property belonging to the estate?

6) Did the court err in assessing interest at the rate of 6% rather than 8% refunds due the estate?

On July 16, 1969, Albert C. Kingseed died testate leaving a will and codicil which were duly admitted to probate on July 24, 1969. Joseph A. Noel was appointed executor and also served as attorney for the estate. At the testator's death he owned two parcels of real estate, a 160 acre farm with two houses thereon and a house and lot located in Amboy, Indiana. The testator devised the farm to the four children of his deceased son, Robert L. Kingseed, and made general bequests of $10,000 to his daughter, Geneva M. Wolff and $5,000 to his granddaughter, Marilyn Foland. The residue was divided in three equal shares among (1) the four children of Robert L. Kingseed, (2) Geneva M. Wolff, and (3) Marilyn L. Foland. The will and codicil failed to mention the Amboy property, valued for inheritance tax purposes at $3,750.

In August or September of 1969 the children of Robert Kingseed along with Mildred Kingseed, their mother and widow of Robert Kingseed, moved from the smaller to the larger house on the farm where they continued to reside. That November, Geneva Wolff and Kenneth Wolff, her husband, filed claims against the estate in excess of $13,000, the validity of which finally being determined, after trial, in favor of the estate in May, 1976 and not appealed. On January 9, 1970 Geneva Wolff filed a petition to contest the will which she eventually dismissed on August 1, 1975.

In 1969, the farm was rented on a fifty/fifty share crop basis. The landlord's share for 1969 was paid into the decedent's estate. However, in February, 1970 without any order from the court Noel advised the tenant and Mildred Kingseed, as guardian of the children, that they could make their own agreement and arrangements relative to the farm operation. Thereafter, the farm was rented on a cash rent basis and the children retained the rent.[2] In addition, Mildred Kingseed, beginning in 1972, rented the second house located on the farm and collected the rent on behalf of her children. The house on the Amboy property was rented by the Estate until 1974, remained vacant thereafter and was not disposed of by Noel.

On September 8, 1976 Noel resigned as executor. A successor was appointed and at the court's direction, Noel filed his final account to which Geneva Wolff filed objections. On February 17, 1977 evidence was heard on the final account by the regular judge of Howard Circuit Court and the trial recessed until March 15, 1977. But on March 9, 1977 the regular judge, on his own motion, ordered withdrawal of submission of the final account and disqualified himself. A special judge was appointed and Noel ordered to file an amended final account which he did on May 25, 1977.

In his amended account Noel submitted an accounting of all funds and property

2. Amounts collected were as follows:

| | |
|---|---|
| 1970 | $ 6,254.50 |
| 1971 | 6,130.91 |
| 1972 | 6,326.00 |
| 1973 | 6,331.00 |
| 1974 | 12,040.00 |
| 1975 | 12,080.00 |
| 1976 | 12,778.58 |
| | $61,940.99 |

coming into his hands, expenditures made by him on behalf of the estate and the cash balance on hand of $8,253.25 to be turned over to the successor administrator. The report recited the distribution of the farm and its income to which Geneva Wolff objected. She also challenged the reasonableness of $11,850 in attorney and executor's fees which Noel had paid himself *without an order from the court.* Finally, she claimed he mismanaged the Amboy property. On November 21, 1977 the parties agreed the special judge should consider the evidence previously submitted and additional evidence was heard. After trial the judge approved the amended final account with the following exceptions: (1) partial distribution of the farm and its income should have been made as of March 1, 1971, not February, 1970, to the children of Robert Kingseed and they were ordered to repay the $6,254.50 farm rent received for the year 1970 with 6% interest; (2) partial distribution of $10,000 and $5,000 to Geneva Wolff and Marilyn Foland should have been made as of March 1, 1971, together with 6% interest and in the event there were insufficient assets in the estate to pay such bequests with interest, any deficiency was to be paid by the children of Robert Kingseed; and (3) reasonable attorney and executor fees amounted to only $6,030 and Noel was ordered to repay $5,820 plus pre–judgment interest of $1,622.[3] The children of Robert Kingseed filed a motion to correct errors, Wolff and Foland filed their cross motion and this appeal was perfected.

## I. COURT'S RETROACTIVE APPROVAL OF DISTRIBUTION OF THE FARM

The parties raise several issues surrounding Noel's distribution of the farm and its

income. Noel's report disclosed distribution of the farm in February, 1970, without court order, to the specific devisees of said real estate, their management and operation of same from February, 1970 to and including 1976, and their collection of rent and payment of taxes and encumbrances during said period. Thus, the farm and its income were not listed as assets to be distributed or turned over to the successor personal representative. The judge retroactively approved the distribution as of March 1, 1971. Wolff and Foland object to this order in two respects claiming 1) the special judge was without authority to approve the farm's distribution, and 2) the approval was contrary to law based on Noel's statutory duty to take possession of the farm and his lack of authority to make a distribution without a court order.

In support of their first contention, Wolff and Foland point out in their brief that the special judge was appointed solely to approve or disapprove Noel's final account and did not acquire jurisdiction over the general administration of the estate noting that at the time of the hearing on the final account the estate was being generally administered by a successor representative under the jurisdiction of the regular judge. They further contend the special judge's jurisdiction was "limited" by Ind.Code 29–1–16–8,[4] which provides for the approval or disapproval of an executor's accounting, and conclude in their brief:

"Since the estate was not in a condition to be closed, and since estate administration was not within the authority of either Mr. Noel or Judge Berger, the order by Judge Berger dated December 12,

---

**3.** The special judge also conditioned Noel's discharge on his contingent liability for penalties assessed against the estate for failure to timely file various tax returns in the event such penalties were assessed and contingent upon a determination of Noel's liability. None of the parties appeal from this portion of the trial court's order.

**4.** IC 29–1–16–8 provides in full:
"Upon the approval of the account of a personal representative, the personal repre-

sentative and his surety shall, subject to the right of appeal and to the power of the court to vacate its final orders, be relieved from liability for the administration of his trust during the accounting period, including the investment of the assets of the estate. *The court may disapprove the account in whole or in part and surcharge the personal representative for any loss caused by any breach of duty."* (Emphasis added.)

1977, which ordered distribution of real estate with income thereon from and after March 1, 1971, was contrary to law for failure to follow applicable law."

This quoted paragraph, representing their sole argument in support of the contention that the special judge lacked authority, does not present us with a cogent argument. Ind.Rules of Procedure, Appellate Rule 8.3(A)(7). Nevertheless, the extent of a special judge's jurisdiction is a threshold matter for several issues raised on appeal. We therefore address the issue of his authority and, more particularly, the propriety of a distribution without a court order and a court's power to retroactively ratify such distribution.

 It is our opinion, under the circumstances of this case, that the special judge's authority extended to all matters to be resolved affecting Noel's discharge and we affirm the judge's power to retroactively approve the distribution of the farm and its income. A special judge duly appointed to try a cause has all the powers and authority of a regular judge as to the particular case and his acts within his jurisdiction become those of the court. *State ex rel. Harp v. Vanderburgh Circuit Court*, (1949) 227 Ind. 353, 85 N.E.2d 254; *Dinkla v. Miles*, (1934) 206 Ind. 124, 188 N.E. 577; 17 I.L.E. *Judges*, § 63 (1959). But where a particular contested issue requiring a hearing and determination is submitted to a special judge, his jurisdiction is limited to the issue submitted. *Zaring v. Zaring*, (1942) 219 Ind. 514, 39 N.E.2d 734; 17 I.L.E.

*Judges*, § 63 (1959). Thus it has been held the filing of an executor's report confers authority on the court to hear and determine the matters involved therein. *Mefford v. Lamkin*, (1906) 38 Ind.App. 33, 76 N.E. 1024, 77 N.E. 960.

In the instant case, the judge was appointed to scrutinize Noel's final accounting and the subsequent objections with a view toward his discharge. In such a review the court must apply the same rules "as govern the settling of the accounts of executors and administrators generally, and it is final and conclusive as to the rights and liabilities of the estate and the deceased or removed administrator." J. Grimes, 2A Henry's Probate Law & Practice, ch. 24, § 3 at 9 (7th ed. 1979).

In the case at bar the issues before the special judge were formed by the final account and objections. Again, Noel's report disclosed partial distribution of the farm in February, 1970 without court approval. Wolff's very objection to Noel's failure to include the farm or its income as assets for distribution raised the issue about which she and Foland now claim the court had no power to review. Wolff, in effect, was seeking the application against Noel of Ind.Code 29–1–16–1 [5] which permits a surcharge against the personal representative for any negligent or willful act or nonfeasance resulting in loss to the estate. We conclude the challenged issue was clearly and properly before the court as a necessary matter to be resolved and Wolff and Foland's suggestion of lack of authority in this regard is without merit.

**5.** IC 29–1–16–1 provides in pertinent part:

"Sec. 1. (a) Every personal representative shall be liable for and chargeable in his accounts with all of the estate of the decedent which comes into his possession at any time, including all the income therefrom; but he shall not be accountable for any debts due to the decedent or other assets of the estate which remain uncollected without his fault. He shall not be entitled to any profit by the increase, nor be chargeable with loss by the decrease in value or destruction without his fault, of any part of the estate.

. . . . .

(c) Every personal representative shall be liable for any loss to the estate arising from his neglect or unreasonable delay in collec-

ting the credits or other assets of the estate or in selling, mortgaging or leasing the property of the estate; for neglect in paying over money or delivering property of the estate he shall have in his hands; for failure to account for or to close the estate within the time provided by this code; for any loss to the estate arising from his embezzlement or commingling of the assets of the estate with other property; for loss to the estate through self–dealing; for any loss to the estate arising from wrongful acts or omissions of his co–representatives which he could have prevented by the exercise of ordinary care; and for any other negligent or wilful act or nonfeasance in his administration of the estate by which loss to the estate arises."

■ In support of their second argument challenging both the propriety of Noel's acts and the trial court's power to ratify such action, Wolff and Foland first rely on Ind.Code 29–1–13–1 which provides:

"Every personal representative shall have a right to, and *shall* take, possession of all the real and personal property of the decedent other than the allowance to the surviving spouse or dependent children. He *shall* pay the taxes and *collect the rents and earnings thereon until the estate is settled or until delivered by order of the court to the distributees.* He shall keep in tenantable repair the buildings and fixtures under his control and may protect the same by insurance. He may maintain an action for the possession of the real property or to determine the title to the same." (Emphasis added.)

In view of the mandatory nature of the statute's language, they conclude Noel was without discretion to distribute the farm and its income without a court order. They further direct our attention to Ind.Code 29–1–17–1, which outlines the appropriate procedure for effecting a court ordered partial distribution. In their brief, and after a recitation of the cited statutes, Wolff and Foland conclude:

"A Court may direct a *partial* distribution. There is no authority for a personal representative to make a partial distribution, and a distribution without a court order would be clearly contrary to I.C. 29–1–13–1, *supra,* which requires the personal representative to take possession of property, and collect the rents. Even a Court, under the above statutory provisions, is without authority to order a retroactive distribution of property and uncollected income."

They further recite prejudice to them resulting from Noel's and the trial court's failure to strictly follow the statutory provisions, since under Ind.Code 29–1–17–7 the income received by the personal representative pending distribution is treated as part of the corpus of the estate, distributable, in part, in the instant case to Wolff and Foland in their capacity as residuary legatees.

We disagree with these contentions, finding there is substantial authority permitting, without condoning, a personal representative's premature distribution. A somewhat similar situation was presented in *In re Estate of Saltzman,* (1969) 145 Ind.App. 488, 251 N.E.2d 595, where this Court affirmed the trial court's approval of an executor's current report, in effect ratifying the executor's earlier unauthorized disposition. In that case the decedent had devised his one–half interest in partnership personal property to his brother and sole surviving partner and the remainder of the estate to his widow and daughter. The brother, who was appointed executor of the estate, sold or traded farm machinery which was partnership property without court order and did not include said equipment as an asset of the estate in an interim accounting to the court. The widow, who was entitled to a distributive share of the estate, objected to the report and sought to remove him for mismanagement of the estate based on his unauthorized disposition and failure to collect assets. In affirming the trial court this Court said:

"Appellant's complaint that this equipment was traded without a court order has no merit as to them, as they were divested by the will of all interest in the same. Although we do not condone the practice of a fiduciary selling or trading property without first obtaining an order of the court, we must find herein that there is no evidence of bad faith and we will not disturb the trade."

Id. at 497–98, 251 N.E.2d at 601.

The decision in *In re Estate of Saltzman, supra* is in accord with the general law in other jurisdictions. Generally it has been said that a payment, which is in all other respects proper, should not be disallowed merely because it was made prematurely. J. Grimes, 2A Henry's Probate Law & Practice, ch. 24, § 11 at 38 (7th ed. 1978). Although made at the personal representative's peril, a distribution without court authorization is generally regarded as legal:

"As stated in Corpus Juris, which has been quoted and cited with approval, vol-

untary payments to distributees without an order or decree of court authorizing them are made by the representative at his own peril, although the representative acts in good faith in making such payments, and in ignorance of the existence of any debt or claim against the estate. Such a payment is merely irregular and voidable, and not void, unless it knowingly disregards the rights of a person entitled to share in the estate, and, although there is authority to the contrary, it is generally regardéd as legal particularly where there is no necessity for administration, or all debts have been paid and the time for presenting others has expired, or where the representative is empowered to act independently of the probate court.

Such a voluntary payment or distribution divests the personal representative of title to the property delivered to the legatee or distributee and vests it in the latter, but this result is not accomplished by a mere formal division of the property without a legal warrant therefor and without delivery. *Furthermore the representative may be entitled to credit for the payments made, if they are correct and not more than the recipient's distributive share, and will be protected by a subsequent decree authorizing or confirming such payments, or allowing an account in which such payments are stated.*" (Footnotes omitted.) (Emphasis added.)

34 C.J.S. *Executors & Administrators* § 503, at 410–11 (1942). Thus, other jurisdictions have held that if another's rights are not affected by unauthorized payments to distributees and the result is that which the law would have accomplished, the personal representative is entitled to credit for these payments in the final account. *E. g., Carroll v. Arnold,* (1928) 107 Conn. 535, 141 A. 657.[6]

Furthermore, it is now a well established policy of the law, and one which this Court is committed to strictly oversee, that estates shall be settled as speedily as possible. *In re McGregor's Estate,* (1936) 210 Ind. 546, 2 N.E.2d 395; *In re Estate of Hogg,* (1971) 150 Ind.App. 650, 276 N.E.2d 898; *Kuzma v. Peoples Trust & Savings Bank, Boonville,* (1961) 132 Ind.App. 176, 176 N.E.2d 134.[7] This concern for the expeditious distribution of a decedent's property is reflected in the Indiana Probate Code Study Commission Comments. In particular, the comments to IC 29–1–17–1 indicate the partial distribution statute was:

"[d]esigned to partially meet the severest of all public criticism–that it takes too long to administer a decedent's estate and that too much time elapses after the death of the decedent before the parties entitled thereto receive their distributive share of the estate. In short, this action provides for a more or less final distribution of the whole estate at a much earlier time than now possible....

... Under this section, the court, upon petition, can safely distribute, at this point, with or without bond, [a portion of the assets remaining after deducting estimated expenses for administration, taxes, etc.]. The balance will then be distributed when the estate is finally settled. The same procedure can be followed in any situation where the amount due a beneficiary can with safety be established."

West's AIC 29–1–17–1. *See also* Study Commission Comments to IC 29–1–13–1. Based on the foregoing, we can reach no conclusion other than that our Probate Code does not sanction extensive delays by residuary legatees to increase their share of the estate. "If the closing of the estate is long delayed as by the determination of the es-

---

6. Even in what would appear to be an extreme situation, the Oregon Supreme Court held where an unauthorized distribution was made before service of garnishment on an administrator, the distribution was valid both under the statute and under the law generally where the court entered a decree ratifying and confirming the distribution. *In re Freitag's Estate,* (1940) 165 Or. 427, 107 P.2d 978.

7. Also see Ind.Code 29–1–16–2 which directs the personal representative to close the estate as promptly as possible.

tate tax, justice would indicate a partial distribution to enable the distributee to obtain the yield from the property which might otherwise, under IC 29–1–17–7, go to the residuary legatee under the will." J. Grimes, 2A Henry's Probate Law & Practice, ch. 25, § 2 at 51 (7th ed. 1979).

Applying these principles to the case at bar, we note that Wolff and Foland would not have been aggrieved by the unauthorized distribution if it had been made timely and in strict accordance with the statute since the decedent's will and codicil vested the farm in the children of Robert Kingseed. There is no showing that the distribution was not made in good faith, nor is there any contention that the distributees were not entitled to the farm or that the distributees were in any way responsible for the long delay in closing this estate. The result is that which the law would have accomplished had the statute providing for partial distribution been utilized. That portion of the trial court's judgment retroactively approving distribution of the farm and its income to the Kingseed children as of March 1, 1971 is affirmed.[8]

## II. SPECIAL JUDGE'S JURISDICTION TO ORDER RETURN OF PARTIAL DISTRIBUTION

While the Kingseed children do not, of course, object to the judge's decision whereby they receive all income after the court ordered date of distribution, they do object to the requirement that they return the first year's income, claiming 1) they were entitled to the income from the real estate as a matter of law; and 2) the judge could only approve or disapprove the final account, and thereby lacked jurisdiction to order repayment.

They first argue that the title to the real estate vests in them, as specific devisees, upon the death of the testator, subject to divestment should it be needed for the payment of claims, taxes and expenses of administration, and thereby claim their entitlement to rents and profits accruing from the land after the death of the testator. In response we agree that at common law real property, absent a testamentary provision to the contrary, descended directly to the heirs or devisees on the death of the owner and no order of the court or act of the personal representative was required to vest possession and title. *Cornet v. Guedelhoefer,* (1941) 219 Ind. 200, 36 N.E.2d 933, *mandate modified* 219 Ind. 200, 37 N.E.2d 681; *Dipert v. Killingbeck,* (1953) 124 Ind. App. 18, 112 N.E.2d 306, 112 N.E.2d 885; *Linville v. Chenoweth,* (1945) 115 Ind.App. 355, 59 N.E.2d 129. Thus, rents and profits from real estate accruing before the decedent's death passed to the personal representative and those accruing afterwards to the heirs or devisees. *Dorsett v. Gray* (1884) 98 Ind. 273; *King v. Anderson,* (1863) 20 Ind. 385; *Lockridge v. Citizens Trust Co. of Greencastle,* (1941) 110 Ind.App. 253, 37 N.E.2d 728.

■ While the 1954 Probate Code did not change the prior law with respect to the immediate vesting of legal title in the heirs or devisees at the date of death, the enactment of IC 29–1–13–1, *supra,* which provides that the personal representative *shall* take possession of real property and *shall* collect the rents, created a duty in the personal representative to take possession until

---

8. Both parties contend the date of distribution, March 1, 1971, is arbitrary. Under the circumstances we cannot say the date was erroneous as a matter of law. During 1970, the first year of the estate's administration, Wolff had filed a will contest which rendered partial distribution in 1970 inadvisable. However, no entries in the record indicate activity in that case (or for that matter in the entire estate) from February of 1970 to August 1974. Since a dismissal pursuant to Ind. Rules of Procedure, T.R. 41(E) may have been warranted in the interim, the trial court could have reasonably found that, although the will contest impaired distribution during 1970, there was no reason to delay distribution during 1971, especially in light of the fact that had the will contest been successful the children's resulting one–half interest in the farm as heirs under the intestacy statute would have provided adequate security for rents collected. Since cash rent payments were made in May and October of 1971, the net effect of the trial court's order was to give Wolff and Foland, as residuary legatees, their share of the income for the first year of administration, 1970, and to give the Kingseed children, the devisees of the farm, the income thereafter.

the court delivered possession to the devisees under an order for distribution. *See Helvy v. O'Neill,* (1972) 153 Ind.App. 635, 288 N.E.2d 553; *Demma v. Forbes Lumber Co.,* (1961) 133 Ind.App. 204, 178 N.E.2d 455, 181 N.E.2d 253; J. Grimes, 1A Henry's Probate Law & Practice, ch. 12, § 1 (7th ed. 1978). For example, in *Demma, supra,* while the Court acknowledged that prior law immediately and absolutely vested title to a decedent's real estate in the heirs and deprived the administrator of any power over the property it nevertheless concluded IC 29–1–13–1 gave possession of the real estate to the administrator. Consequently, one of the principal effects of enlarging the personal representative's powers over the real estate is to "prevent the heir or devisee from recovering possession or collecting rents from third parties until the court delivers possession under an order for distribution." J. Grimes, 1A Henry's Probate Law & Practice, ch. 12, § 1, at 683–84 (7th ed. 1978).

In addition, another provision of our Code, IC 29–1–17–7 [9], clearly provides for the treatment of and disposition of "all income" as a general asset of the estate pending distribution. J. Grimes, 1A Henry's Probate Law & Practice, ch. 12, § 1, at 691 (7th ed. 1978). We must be guided in this regard by the bedrock rule of construction that a statute clear and unambiguous on its face need not and cannot be interpreted by a court. *E. g., Indiana Dept. of State Revenue v. Endress & Hauser, Inc.* (1980) Ind.App., 404 N.E.2d 1173; *accord,* Ind.Code 1–1–4–1.

 This clear mandate of IC 29–1–17–7 was a central issue in *In re Estate of Darby,* (1972) 154 Ind.App. 238, 289 N.E.2d 542, which construed the interests of income beneficiaries under a testamentary trust. The beneficiaries, Hellstrom and Browne, maintained their entitlement to income accruing between the date of the testator's

death and the funding of the trust. Although the will lacked any express provision for the disposition of income during this period, they argued the testator's intent to dispose of the income in the proposed manner was manifested in other ways. In support, they cited their status as the principal objects of the testator's bounty, their equitable title to the trust, and the law's favor for early vesting of estates, to which this Court responded:

"The collective force of these propositions is not sufficient, in our opinion, to persuade us to abandon the application of [IC 29–1–17–7] under the facts of this case. The statute is clear as to its meaning and to hold to the contrary in the instant case would substantially dilute the uniformity being sought by the enactment of such statutes. *It certainly is but a simple matter for a testator to avoid the application of [IC 29–1–17–7] if he so wishes, by the addition of the appropriate language to the will.*

We cannot assume that holding as we do will frustrate the testators intent as Hellstrom and Browne urge. The testators intent is manifested by the instrument to be construed and the absence of the language in that instrument is just as important as what is written in determining that intent." (Emphasis added.)

Id. at 241, 289 N.E.2d at 544. Noting the Trust Code contained a similar provision, the Court concluded that the income accruing before the funding of the trust properly belonged to the corpus of the estate and was distributable under the residuary clause. Given the authorities noted, we must conclude that the income collected by the children before the court–approved date of distribution properly belongs to the corpus of the estate.

 We now return to the children's second contention. Citing only IC 29–1–16–8, *supra* for support, they argue the trial court was restricted to either a bare ap-

---

9. IC 29–1–17–7 provides in full:

"Income received during administration. Unless the decedent's will provides otherwise, all income received by the personal representative during the administration of the estate shall constitute an asset of the estate the same as any other asset and the personal representative shall disburse, distribute, account for and administer said income as a part of the corpus of the estate."

proval or disapproval of the final accounting, thereby precluding any jurisdiction to order repayment by the distributees. Upon a more complete review of the Probate Code's applicable provisions, we must reject such proposed construction.

As we responded previously in rejecting a conceptually similar argument proposed by Wolff and Foland, the trial court was empowered to resolve all questions concerning Noel's distributions before approving the executor's discharge. Again, Wolff and Foland's objections and Noel's failure to list the income as an asset for distribution conferred authority on the trial court to determine the propriety of effectively distributing the first year of income to the children. Our holding that the trial court could retroactively approve an executor's voluntary partial distribution necessarily entails a finding of power to retroactively disapprove a portion of that distribution. *See* IC 29–1–16–8, *supra; In re Estate of Saltzman, supra.* Once the trial court ruled the Kingseed children were entitled to rents accruing only as of March 1, 1971, thereby disapproving their receipt of income prior to that date, it became necessary to require return of the excess to the estate.

Furthermore, the probate court has specific statutory authority to order the return of property distributed. The partial distribution statute contains the following provision: "The court may at any time prior to the decree of final distribution order [the distributees] to return such property to the personal representative if it is for the best interest of the estate." IC 29–1–17–1(a).[10] We believe the provisions of the statute are broad enough to permit a trial court to require a distributee to return assets prematurely distributed without court order,

since even after a court ordered partial distribution the distributee may be held liable to refund when in the best interests of the estate such as for the payment of debts, expenses and legacies.

This principle of a distributee's liability for refund of monies prematurely distributed was recognized in early Indiana cases. See *Smith v. Smith*, (1881) 76 Ind. 238, *overruled on other grounds* 89 Ind. 63 (1883), where the widow claimed a portion of decedent's property already voluntarily distributed by the executor to the residuary legatees. In holding the distributees liable for refund to pay the widow's claim, our Supreme Court explained:

> "It is true that, ordinarily, even an illegal demand, paid without compulsion, and without fraud, and with full knowledge of the facts, or with full opportunity of obtaining such knowledge, can not be recovered back. [Citations omitted.] But such a rule is not applicable to legacies, or to money paid upon distribution by an executor. A legatee or a distributee may be required to give a bond, conditioned to refund his ratable proportion of the estate, if necessary. Decedents' act, secs. 120 and 140. And the failure of the executor to take such a bond will not release the legatee or distributee from his liability to refund, when necessary, for the payment of debts, legacies or claims."

*Id.* at 239; *accord, Stokes v. Goodykoontz*, (1890) 126 Ind. 535, 26 N.E. 391; J. Grimes, 2A Henry's Probate Law & Practice, ch. 25 § 3 (7th ed. 1979). The current statute works a similar result under the trial court's discretion. Consequently, the order for repayment was properly within the trial court's jurisdiction.[11]

---

**10.** IC 29–1–17–1, the partial distribution statute, allows for exercise of the trial court's discretion in requiring the distributee to give security for return of the property distributed.

**11.** The record is inadequate to assure this Court of sufficient notice to acquire in personam jurisdiction over the Kingseed children at the trial level, except for an entry ordering notice to "all interested persons" regarding the initial filing of the executor's final account. Inasmuch as there is no suggestion such juris-

diction is lacking nor any allegation of insufficient notice, and since the Kingseed children apparently participated in the filing of the motion to correct errors, a privilege extended only to parties to the action, we must assume the formal requisites for in personam jurisdiction were either met or waived. *See* Ind.Code 29–1–1–19 (under Probate Code submission to jurisdiction in any hearing constitutes waiver of notice requirement.)

While we affirm the trial court's order requiring the Kingseed children to repay income collected before the court approved date of distribution, a related issue raised by Wolff and Foland still remains for determination. In their response to Noel's final account Wolff and Foland specifically objected to Noel's failure to include the rental value of the two houses on the farm property as assets for distribution. The trial court did not require Noel to account for the rental values, but ordered only the repayment of share–crop income received in 1970 plus interest and ignored the fact that the distributees lived in the smaller house prior to and at the time of the testator's death in July of 1969, moved into the larger house in August or September of that year, and have since resided there leaving the smaller house empty until it was rented in 1972. Wolff and Foland therefore assign error in the trial court's failure to require Noel to account for the fair rental values of both houses from the time of the testator's death until March 1, 1971, since distribution was not approved for this period. We believe the collection of such rentals was a proper matter for consideration by the trial court and remand for that purpose.

■ Several probate code provisions support Wolff's and Foland's allegation of error. With regard to the houses, we again note that Noel was *required* by statute to take possession of all real and personal property belonging to the testator, IC 29–1–13–1, and was duty bound to manage and protect those assets for both the creditors and the distributees by employing reasonable precautions against loss to the estate, and if he failed in this duty he is liable for an resulting loss. *E. g.*, 1B J. Grimes, Henry's Probate Law & Practice, ch. 13 § 3 (7th ed. 1978). Specifically, IC 29–1–16–1(c) provides for a representative's personal liability *"for any loss to the estate arising from his neglect or unreasonable delay* in collecting the credits or other assets of the estate or *in selling, mortgaging or leasing the property of the estate."* Furthermore, Ind.Code 29–1–15–3 specifically empowers the executor to lease property upon court approval:

"Any real or personal property belonging to an estate may be sold, mortgaged, *leased* or exchanged under court order when necessary for the any of the following purposes:

(a) For the payment of claims allowed against the estate;

(b) For the payment of any allowance made to the surviving spouse and dependent children under twenty–one (21) years of age of the decedent;

(c) For the payment of any legacy given by the will of the decedent;

(d) For the payment of expenses of administration;

(e) For the payment of any gift, estate, inheritance or transfer taxes assessed upon the transfer of the estate or due from the decedent or his estate;

(f) For making distribution of the estate or any part thereof;

(g) *For any other purpose in the best interest of the estate."* (Emphasis added.)

An executor's resulting liability even though rents were never actually collected has been stated as follows:

"An executor or administrator who takes over the possession, control, or use of the real property of his decedent must account for the rents and profits which he received or should have received, although it seems that where he acts diligently and honestly with regard to realty in his possession and control he is liable only for such rents and profits as he may have received. Thus a representative who occupies such property for his own purposes, *or who negligently fails to rent it, is liable for the value of the rents and profits which should have been received by the estate;* but where he has occupied realty merely for the purpose of preserving or protecting it, or in order to benefit the estate in some other manner, without any profit to himself, he is not liable for the rental value of such occupation. Where it is necessary to sell lands for payment of debts, and the representative fails to take proper steps to that end

within a reasonable time, he may be held liable for rent. An executor or administrator is not responsible for rents for a time when the real estate was not in his possession or control, *unless he has been guilty of some laches or lack of good faith which has resulted in a loss to those entitled to the rents."* (Emphasis added, footnotes omitted.)

33 C.J.S. *Executors and Administrators* § 259c(1) (1942). We conclude that where as here, an executor is charged with possession of the real estate, he may be held accountable for failure to lease the property and collect the rents if it would have been in the best interest of the estate for him to do so.[12] *See also* Annot., 95 A.L.R.2d 258 § 5 (1964). Noel cannot excuse his failure to collect rents by demonstrating his unwillingness to perform his statutory duty of possession. Having failed in this duty he may be held liable for any resulting loss. The foregoing authorities applied to the facts of the case at bar support the possibility of surcharging Noel for the rental value of the smaller house for the period prior to the court–approved date of distribution. In view of the benefit derived by the Kingseed children from their occupancy of the larger house during this same period, we conclude the trial court, if it deems appropriate after hearing on remand, may exercise its jurisdiction over them in a manner similar to that which afforded the court jurisdiction to order return of farm rents collected and assess them with liability for the fair rental value of the larger house.

However, we must remand for a hearing on these issues inasmuch as the trial court must consider several factors, here absent from the record, in resolving the parties' liabilities. Generally, the interests of all potential beneficiaries of the estate warrant consideration. *Rainer v. Snider*, (1977) Ind. App., 369 N.E.2d 666. The failure to rent the smaller house (and for that matter the larger house also) may have been prudent in view of the possibility of early distribu-

tion and the desirability of turning over the property to the distributees without further encumbrances. See J. Grimes, 1A Henry's Probate Law & Practice, *supra*, ch. 12 § 5 at 706 (executor has no power to bind estate to a new contract without court approval). Nor is there any indication of whether the smaller house could have been rented since the record lacks any evidence of the condition of the house or the probability of obtaining a reliable short–term tenant. Furthermore it may well have been a proper exercise of discretion for Noel to permit Mildred and the Kingseed children to occupy the larger house in return for maintenance and upkeep. *See, e. g., In Spiss's Estate*, (1966) 50 Misc.2d 595, 271 N.Y.S.2d 11; Annot., 31 A.L.R.2d 243 (1953). All these factors in addition to evidence of the fair rental value of the properties are proper considerations for the trial court in determining the amount due the estate, if any. *See also* Annot., 95 A.L.R.2d 258, § 5(d) at 283–84 (1964). The cause is therefore remanded for a determination of these questions.

## III. *RETROACTIVE DISTRIBUTION OF THE GENERAL BEQUESTS*

■ We next consider whether the court's order retroactively distributing the general bequests to Wolff and Foland was an abuse of discretion, contrary to the evidence or contrary to law. The trial court, *sua sponte*, found the decedent's bequests of $10,000 to Wolff and $5,000 to Foland should have been distributed March 1, 1971 and ordered present distribution with 6% interest from that date, holding the children of Robert Kingseed liable for any deficiency. Although Noel and the children of Kingseed raise several meritorious arguments to support various allegations of error in this portion of the trial court's order, the special judge's lack of jurisdiction to order distribution of general bequests is dispositive here.

12. We note the law is otherwise in those jurisdictions where the executor has no duty of possession of real estate unless for the payment of debts and necessary administrative expenses. *See Riling v. Cain*, (1967) 199 Kan.

259, 428 P.2d 789. In such jurisdictions, the executor may have no responsibility to find a tenant and collect rents. *See Estate of Reiman*, (1956) 272 Wis. 378, 75 N.W.2d 564.

Beginning with the petition for probate, all the proceedings in the instance case were initiated in the Howard Circuit Court with the regular judge presiding. During a delay in the first hearing on Noel's account, the regular judge disqualified himself on his own motion from "serving further as Judge herein *for the purpose of hearing such final account and objections . . .,*" (emphasis added) and arranged for the selection of a special judge pursuant to Ind.Rules of Procedure, Trial Rule 79. Clearly, the regular judge submitted *only* the final account and the written objections for determination by the special judge, retaining jurisdiction over the estate generally.

Probate and administration of a decedent's estate often entail judicial oversight and resolution of numerous claims and issues, and may require various forms of proceedings at appropriate stages. As in the case at bar, it is not unusual for the administration of a decedent's estate to be accompanied by other civil proceedings, such as will contests, claims against the estate and other disputes, which may require separate judicial resolution. We are not aware of any authority suggesting that the selection of a special judge for the resolution of a specific issue divests the regular judge of general jurisdiction over remaining estate matters.

Moreover, the facts in the present case are strikingly similar to those presented in *Zaring v. Zaring*, (1942) 219 Ind. 514, 39 N.E.2d 734, where the general jurisdiction of the regular judge was upheld as against the special judge's order on matters not submitted to the latter for determination. In *Zaring*, a deed of trust executed by the decedent was filed in the probate court. Three of the trustees petitioned for the appointment of a bank as rental agent for the trust corpus, to which the fourth trustee objected. A special judge, assigned to determine the specific question presented, subsequently authorized the appointment and additionally taxed an award of attorney fees against the trust. A similar subsequent award of fees by the regular judge

was appealed to the Indiana Supreme Court. In deciding the propriety of the regular judge's order, the Supreme Court necessarily addressed the special judge's order which was then being reviewed by this Appellate Court. The Supreme Court first noted the regular judge was vested with jurisdiction over all matters arising under the trust's administration except for the sole issue submitted to the special judge and formed by the petition and written objections. In concluding the special judge was without jurisdiction to decide the question of attorney fees, the Court explained:

"Neither the petition nor the objections refer in any manner to allowance of fees. Assuming that there may be taken from a judge under whose direction a trust is being administered a particular contested issue requiring a hearing and determination, it seems to us that the jurisdiction should be confined to the narrow issue submitted to him and that all other matters must remain with the judge who has general jurisdiction of the trust. Applying this principle, it is apparent that the decree as to attorney fees made by the special judge was outside of his jurisdiction and void. So much of his decree may and doubtless will by the Appellate Court be treated as surplusage."

*Id.* at 520, 39 N.E.2d at 736. Thus it appears settled that issues outside those presented to a special judge for separate determination remain within the general jurisdiction of the regular judge. *See also Hamilton v. Huntington*, (1944) 223 Ind. 143, 58 N.E.2d 349, 59 N.E.2d 122.

As in *Zaring* the special judge in the instant case erred in rendering a judgment on an issue not presented to him for determination, i. e., one outside the issues formed by the final account and not related to the issue of Noel's discharge. Even after approval of his final account, the estate remained open with several matters left for administration and judicial approval. These subsequent matters, which included distribution of the general bequests, were properly within the regular judge's jurisdic-

tion.[13] That portion of the special judge's order providing for the distribution of the general bequests is contrary to law.[14]

## IV. ATTORNEY AND EXECUTOR'S FEES

■ Noel objects to the trial court's award of only $6,030.00 in attorney and executor fees. In his sworn final account, filed October 20, 1976, Noel claimed credit for the lump sum of $11,850.00 in fees already paid to himself and requested the court to ratify the payments since he had not previously obtained court approval. Although Ind.Code 29–1–16–4[15] required the

---

**13.** We are aware of amendment (15) to T.R. 79 which provides:

"Unless the special judge is unavailable by reason of death, sickness, absence or unwillingness to act, the jurisdiction of a special judge shall continue in all proceedings filed under a given cause number, including without limitation, proceedings to enforce the judgment or to modify or revoke orders pertaining to custody, visitation, support, maintenance and property dispositions and for post–conviction relief."

Under this rule, and distinct from the question decided *supra*, a special judge's jurisdiction appears to extend after entry of an appealable order to those matters which were properly within his jurisdiction prior to entry of that order. We do not, however, read the rule as providing for extension of general jurisdiction over matters which were never before a special judge appointed solely for trial on a specific issue. See Advisory Committee Note, 4 W. Harvey & R. Townsend Indiana Practice, T.R. 79 at 126–27 (Supp.1980).

**14.** The other meritorious arguments raised by the children of Kingseed, alluded to earlier, concern whether the court could 1) require the children, as specific devisees, to pay any deficiency upon distribution of the general bequests in view of the abatement statute, and 2) award interest of the general bequests. Our holding, however, voids that entire portion of the trial court's order distributing the general bequests, rendering discussion of these additional contentions unnecessary.

The current financial condition of the estate is not clear from the record submitted for review. It appears, however, that sufficient assets may exist to effect present distribution of the general bequests from the general assets of the estate once the amounts properly due from Noel and the children are returned per the special judge's court order. It therefore appears application of the abatement statute as between the specific and general legatees might not be required in later proceedings.

We do note, however, that the Probate Code provides for abatement of general bequests prior to property specifically devised. Ind.Code 29–1–17–3. Consequently, the trial court could not require the specific devisees to pay any deficiency in the event there were insufficient assets on hand to pay the $15,000 in general bequests. Furthermore, had the court's distribution of the general and specific bequests resulted in any deficiency, the general legatees

would have been liable to the estate under the partial distribution and abatement statutes to the extent of the estate received by them.

We also note general legacies under Indiana law do not bear interest unless a contrary intent is indicated in the will. Ind.Code 29–1–17–8. In contrast to this recent statutory prohibition, the general common law rule allowed assessment of interest on general legacies but only after the expiration of the period allotted for estate administration. Interest was allowed under these circumstances as compensation for the deprivation of a legacy beyond the date on which it was payable. 97 C.J.S. *Wills*, § 1345 (1957). *See Roberts v. Malin*, (1854) 5 Ind. 18. However, the cases awarding interest on general bequests antedate passage of IC 29–1–17–8. *In re Estate of Darby*, (1973) 154 Ind.App. 238, 289 N.E.2d 542. The change may in part be due to the Probate Code provision for partial distribution upon application of any distributee at any time during administration, IC 29–1–17–1(a), since this provision substantially alleviates the necessity for delays in distribution. The disallowance of interest on general bequests may also more accurately reflect the testator's intent to devise a particular quantity of a thing and no more. We note that Wolff and Foland argue in support of the award of interest as a charge against Noel for delay in closing the estate. This argument is untenable, however, since the trial court did not require payment by Noel but charged interest against the current personal representative, presumably payable from the general assets of the estate.

**15.** IC 29–1–16–4 provides in full:

"Accounts rendered to the court by a personal representative shall be for a period distinctly stated and shall consist of three (3) schedules, of which the first shall show the amount of the property chargeable to the personal representative; the second shall show payments, charges, losses and distributions; the third shall show the property on hand constituting the balance of such account, if any. *When an account is filed, the personal representative shall also file receipts for disbursements of assets made during the period covered by the account.* Whenever the personal representative is unable to file receipts for any disbursements,

filing of receipts for credits claimed in the account, Noel failed to include any vouchers or other exhibits to support his expenditures. Wolff and Foland objected to the credits pointing out this defect and specifically requested an itemization of services rendered the estate and proof that the fees were reasonable.

Such documentation was not provided before the initial hearing which proceeded on February 17, 1977, before the regular judge. After some testimony was presented the judge disqualified himself and ordered the withdrawal of Noel's final account.

Noel's amended final account was accompanied by cancelled checks for each expenditure except for the fees he had withdrawn. The latter disbursement was supported only by Noel's single personal receipt for attorney and executor fees paid at "various" times. Wolff's and Foland's sworn amended objections again challenged the reasonableness of these fees, whereupon the special judge ordered Noel to provide specific documentary evidence supporting the payment. On November 21, 1977, the day of the hearing, Noel responded by filing an affidavit alleging in excess of 250 hours spent on matters connected with the estate and claiming $50 per hour as a "fair and reasonable value" for his services. Appended to the affidavit was a handwritten breakdown of services rendered the estate and the time spend on each claimed item.[16] During his testimony as a witness for Wolff and Foland, Noel did not further substantiate the billing or present expert witnesses to justify either the hours expended or confirm the customary rate for similar services, but in his brief he appears to rely solely on the affidavit although it was never formally submitted as evidence. After the hearing the judge reduced Noel's award of fees to

$6,030 and released Noel as Executor subject to the reimbursement of attorney fees with interest and subject to a possible future determination of his liability for any penalties assessed against the estate for failure to timely file federal estate tax returns and federal and state income tax returns. Neither Wolff nor Foland object to the award; Noel, however, claims the award was insufficient and therefore arbitrary and capricious, an abuse of discretion, contrary to the evidence and contrary to law.

A review of the record, including testimony presented at the hearing, reveals substantial support for the court's reduction of the fees in question.

Noel, who was admitted to the Indiana Bar in 1940, represented the decedent's estate for a period of approximately seven years beginning in 1969. During his representation of the estate and in addition to filing the final account under consideration here, Noel petitioned for probate of the will, filed a partial inventory and report of sale of personal property, paid the estate's ordinary debts and claims, represented the estate in a will contest which was dismissed on the plaintiff's motion prior to trial, and defended two consolidated claims against the estate in a four day jury trial.[17]

The record and Noel's testimony also indicate several deficiencies in Noel's representation of the estate. The record reveals *Noel failed to take any court action in any matter concerning the estate for a period of over four years.* After granting Wolff's request for a trial continuance of her claims in April of 1970, to which Noel offered no objection, no action in the entire estate proceeding was forthcoming until August of 1974 when the court, *on its own motion,*

the court may permit him to substantiate them by other proof. The court may provide for an inspection of the balance of assets on hand. The court may, upon its own motion, or upon petition, provide that verification of accounts or credits thereon may be made by the unqualified certificate of a certified public accountant in lieu of receipts or other proof." (Emphasis added.)

16. The copy of the itemization submitted on appeal was substantially illegible and contained numerous coded and abbreviated entries without an explanatory legend.

17. The claims were based on the theory of quantum meruit for services performed by Geneva Wolff and her husband Kenneth during the decedent's lifetime.

ordered a hearing to show cause why the claims should not be dismissed pursuant to Ind.Rules of Procedure, Trial Rule 41(E) (dismissal for failure to prosecute civil actions). The special judge was therefore confronted with Noel's participation and acquiescence in the unreasonable and unexplained delays in settling the estate,[18] which directly conflicted with the clear policy of our Probate Code to settle estates as speedily as possible for the protection and in the interest of creditors and heirs alike. IC 29–1–16–2; *In re McGregor's Estate*, (1936) 210 Ind. 546, 2 N.E.2d 395. When sanctions in the form of a reduction of fees become necessary to safeguard and enforce this central policy, we are fully prepared to support them.

Although such delays, in our opinion, were more than a sufficient basis to warrant the reduction, there was further support including evidence indicating questionable handling of the estate's accounts. It appears Noel failed to maintain a separate account for the estate's assets. Xerox copies of checks included in the record of the hearing and written by Noel to satisfy the estate's debts appear to have been drafted on both the law firm's checking account and a "trust account," the latter of which Noel testified contained *all* funds for his trust obligations. There was also testimony by Noel tending to indicate an inadequate balance in the trust account for this estate. According to Noel, between May and September of 1973, the estate's balance was $14,138.72, although he also conceded records submitted by him in a disciplinary action indicated a low balance of $11,892.82, in the trust account during the same period. See *In the Matter of Noel*, (1976) 265 Ind. 98, 350 N.E.2d 673, wherein the Court condemned Noel's practice from 1963 to 1973 of commingling funds and failing to maintain appropriate records and accountings of clients' funds.

The hearing further revealed Noel had delegated management of the Amboy property to Mildred Kingseed, who, as guardian of the Kingseed children and as an individual, had conducted virtually all business matters regarding the real property including arrangements for maintenance and contact with prospective buyers of the Amboy rental property. In effect, Noel's participation in the management of the Amboy property was limited to reimbursement of Mildred Kingseed for necessary expenses.

In 1976, after Noel resigned as executor, the estate still remained open for administration. The general bequests remained undistributed, and estate and income taxes remained unpaid.

■ Although the extent of damage, if any, caused by Noel's conduct was not specifically determined, (and we do not seek here to adjudicate his liability for any loss to the estate) such conduct is a proper consideration for the trial court when awarding attorney and executor's fees. The importance of considering a variety of factors in awarding fees for the administration of an estate has long been recognized in Indiana:

> "In making the allowances the court may take into consideration the labor performed, the nature of the estate, the difficulties attending the recovery of the assets and location of heirs or devisees, settlements in the estate, the peculiar qualifications of the administrator, *her faithfulness and care*, and all other factors necessary to aid the court in a consideration fair to the estate and reasonable for the personal representative and attorney, *Ex parte Hodge*, supra; *Pollard v. Barkley*, (1888) 117 Ind. 40, 17 N.E. 294." (Emphasis added.)

*In the Matter of the Estate of Newman*, (1977) Ind.App., 369 N.E.2d 427, 433.

■ Similarly, when awarding fees for services rendered as an attorney, the general quality of effort expended by the attorney is also a proper consideration. *Frith v. State*, (1975) 263 Ind. 100, 325 N.E.2d 186. *See also Neville v. Davinroy*,

---

**18.** During the four year hiatus in the case the will contest action filed by Wolff also remained unresolved.

(1976) 41 Ill.App.3d 706, 355 N.E.2d 86. Furthermore, in the case of attorney fees, we have recognized a trial judge's particular expertise in valuing such services. *In re Lockyear*, (1974) 261 Ind. 448, 305 N.E.2d 440; *McDaniel v. McDaniel*, (1964) 245 Ind. 551, 201 N.E.2d 215; *Fox v. Galvin*, (1978) Ind.App., 381 N.E.2d 103.[19] The amount of allowance for services as attorney and executor is therefore left to the discretion of the trial court and will not be disturbed on appeal in the absence of abuse. *In the Matter of the Estate of Newman, supra; In re Meyer's Estate*, (1966) 138 Ind.App. 649, 215 N.E.2d 556; *Pelkey v. Strom*, (1963) 135 Ind.App. 163, 187 N.E.2d 753; *Ex parte Hodge, Administrator*, (1892) 6 Ind.App. 487, 33 N.E. 980.

Noel argues such an abuse is demonstrated where the trial court awards substantially less than the amount requested in the absence of evidence contradicting the hours and rate claimed by the representative or attorney. In effect, he seeks a restriction of the trial court's power to a consideration of only the hours and rate claimed and relies heavily on *In re Meyers Estate*, (1966) 138 Ind.App. 649, 215 N.E.2d 556, in support of that proposition. The facts of that case, however, are readily distinguishable. Indeed, in *Meyer's Estate*, the only evidence supporting the trial court's substantial reduction of fees was the objectors' allegation of neglect of duty and mismanagement.

Specifically, the objectors charged the representative with lengthy delays in closing the estate and with failure to hold open the filing of the federal estate tax return to allow deductions for future fee awards. This Court noted that the uncontradicted evidence disclosed the delays were caused solely by the heirs, and further that the delays caused an *unforeseen* increase in attorney fees. In the absence of any support for a reduction of fees, and in the presence of substantial support for the amount claimed including the uncontradicted testimony of two expert witnesses, this Court held the meager award was an abuse of discretion.

In contrast, the present case discloses substantial evidence of Noel's delay in terminating litigation and consequently in settling the estate, questionable handling of the estate's accounts, failure to timely file the requisite tax returns, failure to obtain court approval before distributing substantial assets and general inadequacies of representation and management which support the reduction of fees. In his favor, Noel only presented a bare assertion that his withdrawal of a substantial amount in attorney and executor's fees was "fair and reasonable."[20] As we recently explained in *Diaz v. Duncan*, (1980) Ind.App., 406 N.E.2d 991:

> "the personal representative is regarded as the trustee or agent appointed by law

---

19. Compare the cited authorities with *U. S. Aircraft Financing, Inc. v. Jankovich*, (1980) Ind.App., 407 N.E.2d 287, 294–96. In that case this District reversed the trial court's award of $30,000 in attorney fees where the only evidence presented to support the award was the client's testimony that he had been charged that amount. We believe *Jankovich* accurately represents this district's disapproval of an award of attorney's fees without a basis in evidence presented on the factors enumerated in Disciplinary Rule 2–106, particularly in complicated or unique cases. *See, e. g., Sears, Roebuck & Co. v. State*, (1967) 248 Ind. 169, 225 N.E.2d 175; *Waverly Co. v. Moran Electric Service*, (1940) 108 Ind.App. 75, 26 N.E.2d 55. In contrast to the situation presented in *Jankovich, supra*, we have no difficulty in upholding the trial court's exercise of its expertise in the present case where the reduction of the award was supported, among other things, by evidence of unwarranted delays in settling the

estate which may well have, in turn, stimulated further litigation.

20. According to the Inheritance Tax Schedule finally filed in October of 1976, the estate at the testator's death consisted of approximately $119,000 in real and personal assets, including farm property valued at $97,000, which left approximately $22,000 in undistributed assets for management by the executor. We also note the debts and expenses *not including executor and attorney fees* were estimated at approximately $12,000 indicating that at the time of death, the assets left for distribution, without consideration of future income to the estate, were insufficient to pay the general bequests of $15,000 to Wolff and Foland. Income accruing to the estate during its administration *may* provide sufficient funds to honor such general bequests. See footnote 14, *supra*.

for the benefit and protection of both creditors and distributees. He bears a heavy burden in this regard for '*[i]t is his duty* to guard against error in distribution by exercising the greatest possible care *to see that all available evidence is fully and truthfully presented to the court in a hearing of a petition for distribution of the estate.* (citations omitted)' *Schumacher v. Adams County Circuit Court*, (1947) 225 Ind. 200, 205, 73 N.E.2d 689, 691–92." (Emphasis added.) *Id.* at 1002. We must find Noel's presentation to the court on this issue wholly wanting in light of his obvious failure as personal representative to "fully and truthfully present all available evidence."[21] *Id.*

We therefore affirm the trial court's award of fees, mindful that they are subject to that part of the judgment, not appealed from, which reserves a power to surcharge Noel for penalties incurred by the failure to file returns upon a proper determination of his liability for these penalties, and further subject, on remand, to a possible surcharge for failure to collect rents on the smaller house.

## V. *AMBOY PROPERTY*

■ Wolff and Foland assign error in the trial court's failure to require Noel to account for an alleged decrease in value of the Amboy property since 1974 and for Noel's failure to rent the property since that date.

Specifically, they allege Noel failed in his duty under IC 29–1–13–1 to "collect rents" since 1974 and allowed the property to depreciate. In his final report, Noel accounted for the Amboy property and for rent collected until 1974, testifying he had not rented the property since that date, but that the Amboy property's availability had

been publicized at two local large industrial plants without success. Assuming Noel had a duty to rent, we find this was sufficient evidence for the court to conclude Noel had made reasonable attempts to rent the property.

Furthermore, there was no competent evidence presented to establish depreciation in the value of the Amboy property due to waste. Noel testified he had the property appraised during the estate's administration for $4,750. He eventually listed the property in the inheritance tax schedule for $3,750 and specifically noted the $1,000 discrepancy between the appraised and reported value was due to a defect in title.[22] Noel also testified he had seen a contract of sale of the property before the testator's death, but could not recall the amount although he thought it might have been around $5,500. The nature of that contract was also unclear. Although some payments may have been made, in any event the contract was later abandoned. There was also testimony that the property had deteriorated since 1974, but there was no evidence to establish a decrease in market value from the date of testator's death to the time of Noel's resignation with any acceptable degree of certainty. The evidence of the contract sale was too speculative to establish market value as of 1969, let alone 1974. *See State v. Lincoln Memory Gardens*, (1961) 242 Ind. 206, 177 N.E.2d 655. Since we cannot find the testimony led only to a conclusion that Noel was responsible for a decrease in the value of the Amboy property, the trial court did not commit error in this regard. Ind. Rules of Procedure, Trial Rule 52(A).

## VI. *INTEREST*

■ Wolff and Foland correctly assert the judge applied an incorrect rate of

21. We would be less than candid if we did not express our disapproval of his cavalier attitude toward the hearing in complete disregard of his obligation for full disclosure as personal representative. In carrying his burden of proof at the hearing and in response to serious accusations of mismanagement he merely asked the court to take judicial notice of the record including his final account and rested his case

and when later questioned regarding his experience in probate matters he evasively responded: "more than some, less than others."

22. In a question posed Noel, it was suggested that at the time of the hearing the Amboy property had been sold for $3,750. Noel responded that he was aware of a sale but did not know the purchase price.

interest, 6%, rather than the statutory rate, 8%, to repayments to the estate by the Kingseed children for farm rental and by Noel for fees. We agree. *See Hirsch v. Merchant's National Bank & Trust Co. of Indiana*, (1975) 166 Ind.App. 497, 336 N.E.2d 833. We do not agree with Noel's contention, unsupported by authority, that Ind. Code 24–4.6–1–101 through 103 and similar former provisions allow for a judge's discretion in determining the rate of prejudgment interest. When the rate of interest is not otherwise agreed upon by the parties, the statutory rate of prejudgment interest is applicable. *Id.* Therefore, we find the prejudgment interest rate applicable to any refunds due the estate in this case should be assessed at the rate of eight percent.

YOUNG, P. J., and CHIPMAN, J., concur.